920 P.2d 192 (1996)
82 Wash.App. 646
AMERICAN NATIONAL FIRE INSURANCE COMPANY, Plaintiff,
v.
B & L TRUCKING & CONSTRUCTION CO., INC., a corporation; Eagle Trucking, Inc., a corporation; Camille M. Fjetland, as successor in interest to William K. Fjetland, deceased, and Jane Doe Fjetland, individually and as a marital community; and Executive Bark, Inc. a corporation, Respondents, and
Northern Insurance Company of New York, a corporation, Appellant.
No. 17010-8-II.
Court of Appeals of Washington, Division 2.
May 17, 1996.
As Amended June 21, 1996.
Publication Ordered July 12, 1996.
As Further Amended August 9, 1996.
*194 Bradley Alan Maxa, Linda C.J. Young, and Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, for Respondents.
Thomas Stephen James, Davis Wright Tremaine; Jerrett E. Sale, Bullivant Houser Bailey, Pendergrass & Hoffman; and William Jones Price and Jacquelyn A. Beatty, Karr Tuttle Campbell, Seattle, for Appellant.

*193 OPINION
BRIDGEWATER, Judge.
Northern Insurance Company of New York appeals from a judgment requiring it to provide coverage under its policies with William Fjetland for the damage done by pollution from dumpings by Fjetland-owned entities into a landfill where a combination of slag and woodwaste had unexpectedly produced arsenic as a contaminate. We hold that the policy provisions of "occurrence" and the "pollution exclusion" have been met; and that because of ambiguity in policy language there should be no apportionment of damages even though Fjetland was insured only during a portion of the polluting period.
In 1974, Fjetland began hauling slag from ASARCO, a copper smelter in greater Tacoma, to log yard operators in the Tideflats where it was used as fill. Though this rock/metal by-product of smelting operations was once thought to be inert (i.e. non-contaminating), experts belatedly determined that it leaches when in comes in contact with water. As slag contains the metallic by-products of the smelting operation (including arsenic and lead), slag leachate can contain high levels of these, and other, contaminants.
After 1974, Fjetland, through two of his corporations (B & L Trucking & Construction Co., Inc. and Eagle Trucking Inc.), began hauling woodwaste/slag to various landfills. Woodwaste is not normally harmful. It is simply the naturally occurring by-product of decaying wood which, unless it is found in high concentrations, "can be beneficial by supplying needed nutrients to micro-organisms."
In 1978, Fjetland purchased property which, after the Tacoma-Pierce County Health Department approved a permit, he used as a landfill, "hauling ... bark, dirt, rocks and whatever slag" needed to be removed from the log yards. Though the landfill was operated by Eagle Trucking, as there were no buildings at the landfill, its operations were conducted from B & L's nearby business office on Marine View Drive.
In January 1981, the federal government classified the landfill as a wetland area. As a result, the Health Department issued a cease-and-desist order to Fjetland. However, through 1982, it allowed him to continue to bring material into the landfill for the limited purpose of "contouring" the land. Soon thereafter, with the Health Department's approval, Fjetland began a woodwaste recycling operation at the landfill. All operations in the landfill stopped in July 1984 when Pierce County found it was being operated in violation of the zoning regulations.
Over the years, Fjetland purchased general liability insurance policies from a variety of insurers, including American National Fire Insurance (American National) and Northern Insurance Company of New York (Northern). At issue here is an annual policy issued August 15, 1978 (Policy 78-79), annual policies issued from August 11, 1980, to August 10, 1983 (Policy 80-83), and an annual policy issued August 11, 1983 (Policy 83-84). Under these policies (with relevant differences discussed below), Northern agreed to *195 insure Fjetland and his corporations for damages "caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises." An "occurrence" was defined as: "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Emphasis added.) Furthermore, these policies contained a "pollution clause" which excluded coverage for "discharge, dispersal, release or escape" of "waste materials or other irritants, contaminants or pollutants into or upon land," unless "such discharge, dispersal, release or escape is sudden and accidental."
In 1980, high levels of arsenic and other contaminants were discovered around the Commencement Bay area. By the mid-1980s, testing established Fjetland's landfill was contaminated by arsenic. In February 1989, Fjetland and his corporations were named as third-party defendants in a federal CERCLA action[1]. In March, 1991, the federal court held as to Fjetland's landfill: (1) slag, rather than woodwaste, caused the contamination; (2) B & L was not responsible for any of the clean-up costs; (3) ASARCO was wholly liable for clean-up costs prior to 1981; and (4) Fjetland and Eagle Trucking were both 7% liable for the post-1981 clean-up costs.
In February, 1990, American National filed this declaratory judgment action against Fjetland and his corporations. American National asserted Fjetland "expected" contamination at his landfill and the "pollution" of his landfill was not "sudden" or "accidental," and thus it was not required to provide coverage for damages relating to the landfill contamination. In the same action, American National sought contribution/indemnity from Northern.
Northern brought a cross-claim for declaratory judgment against Fjetland based upon the similar language of its own policies. Fjetland brought cross-claims against all of his insurers seeking a declaration of coverage for any damages relating to the landfill contamination. Fjetland also requested reasonable attorney's fees.
Prior to trial, Northern moved for summary judgment on a number of issues. Northern sought a ruling it was not obligated to provide coverage for the landfill as that property was not listed as part of Fjetland's "insured premises." Noting Policy 78-79 and Policy 80-83 included language covering "business ... conducted at or from the insured premises," but that Policy 83-84 did not, the trial court denied the motion as to Policy 78-79 and 80-83, but granted it as to Policy 83-84.
Northern also sought a ruling that Fjetland was not entitled to coverage because under the "pollution clause" he had "intentional[ly]" discharged "log yard waste" at the landfill. Finding that the policy was ambiguous and there was a question of fact as to whether Fjetland had knowledge that he was discharging "waste materials," the trial court denied the motion.
Northern also sought a ruling that "remediation [costs] shall be allocated pro rata between [Fjetland] and its insurers based on the insured and uninsured periods of property damage at the landfill." Fjetland responded with his own motion on this issue, arguing all of his insurers were jointly and severally liable regardless of the period of their coverages. The trial court agreed with Northern there should be such an allocation, but left the length of the allocation period undecided.
Fjetland died on June 8, 1991. In the federal CERCLA action, in which Northern was not a participant, he had been deposed. In this case, he had also been deposed and one of the insurers asked him "[d]o you adopt the testimony that you gave in the [CERCLA] proceeding." Fjetland stated he did and the CERCLA deposition was made an exhibit to the deposition. Northern moved to exclude the introduction of statements *196 from the CERCLA deposition. The trial court denied the motion, holding the CERCLA deposition had been "incorporated" and Northern had "waived" any objection.
Fjetland moved in limine to prevent admission of evidence of the existence of the "pollution clause." Finding that the factual issues under the "pollution clause" were similar to the factual issues under the "occurrence" clause, the trial court granted the motion.
At trial, the issue was what Fjetland knew and when he knew it. Testimony was given by officials from the Washington State Department of Ecology (WDOE) and the Tacoma-Pierce County Health Department. There was testimony of an occasional woodwaste "leachate breakout" from the landfill, but none of these breakouts caused any environmental damage.
By deposition testimony, Fjetland denied ever knowing about the contamination problems of slag and stated he only learned of the contamination problems at his landfill around 1982, after testing had occurred. Louis Miller, Jr., manager of a log yard, testified Fjetland never expressed any concern about contamination from slag in that time period.
The evidence adduced at trial demonstrated that, although the arsenic began to leach as soon as the slag was dumped into the landfill, the contamination was not related to the woodwaste. Furthermore, the evidence demonstrated that had only woodwaste been placed in the landfill, there would not have been any arsenic contamination or resulting necessity for a clean-up.
The jury found Fjetland had expected property damage in "June 1982." On February 19, 1993, after Fjetland's attorney presented an affidavit detailing $181,445.70 in attorney's fees and costs, the trial court entered partial declaratory judgment and final judgment pursuant to CR 54(b) in favor of Fjetland and awarded him $133,911.99 in attorney's fees.
On February 26, 1993, the trial court held a hearing to determine the apportionment period. After hearing argument, the court picked April 29, 1987, as the final date of that period. The trial court noted that was the date the WDOE issued an order requiring clean-up of the landfill. In its order, the trial court found:
[r]emediation costs will be apportioned equally on a pro-rata/per year basis between all insured and uninsured periods between January 1, 1981 and April 29, 1987 Uninsured periods include those years following the month and year in which the jury determined the insureds expected property damage at the landfill.
As Northern had been found liable on two of its policies with Fjetland (i.e. the policies with effective dates of August 11, 1980 to August 10, 1981, and August 11, 1981 to August 10, 1982), Northern was found liable for two-sevenths of the eventual clean-up costs.
Both Northern and Fjetland appeal from various rulings of the trial court. At the outset, we note a few of the basic rules of insurance contract interpretation which guide our analysis. The interpretation of insurance policies is a question of law and the policy language is to be interpreted as an average insurance purchaser would understand it giving undefined terms their "plain, ordinary, and popular" meaning.[2] If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists.[3] However, if a policy provision is ambiguous (i.e. fairly susceptible to two different but reasonable interpretations), and the court cannot resolve the ambiguity by resort to extrinsic evidence, the interpretation most favorable to *197 the insured applies.[4] This rule applies with "added force to exclusionary clauses which seek to limit policy coverage."[5]
We also note a recent decision of the Washington Supreme Court which guides our analysis. In Queen City Farms, the court was faced with conflicting interpretations of the "occurrence" and "pollution" clauses of insurance polices similar to those involved herein. There, the "occurrence" clause covered incidents which "unexpectedly and unintentionally" resulted in damage.[6] There, the "pollution clause" excluded coverage unless "discharge, dispersal, release or escape is sudden and accidental."[7]
The court determined numerous issues relevant here. As to the "occurrence" clause, the court held "the burden of proof [is] on the insured to establish that subjectively injury or damage was neither expected nor intended."[8] As to the "pollution clause," which the court found to be ambiguous, the court held:
"sudden" means "unexpected".... Thus "sudden and accidental" means "unexpected and unintended". Both terms are given meaningful effect. Reading the occurrence clause and the exclusion together, pollution damage resulting from an accident, including continuous or repeated exposure to conditions, which is neither intended nor expected is covered under the occurrence clause. The exclusionary language of the qualified pollution exclusion precludes coverage for damage resulting from the listed polluting events. The polluting event may be the discharge, dispersal, release, or escape of materials from a place of containment into the environment where they cause damage. Coverage is re-triggered, however, under the exception to the exclusion, where the discharge, dispersal, release, or escape is sudden and accidental, i.e., unexpected and unintended. Therefore, if the damage results from the dispersal of material into the groundwater from a place of containment where the insured believed they would remain or from which they would be safely filtered, and that dispersal was unexpected and unintended, then coverage is provided under the policies.[[9]]
With this guidance in mind, we turn to the particular issues raised by the parties.

I
The trial court held that Policy 80-83 insured the landfill, but that Policy 83-84 did not. As to Policy 80-83, there is conflicting policy language. One clause notes Northern agreed to
pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
bodily injury or
property damage
to which this insurance applies, caused by an occurrence, and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises....
(Emphasis added.) Another clause (the only clause in Policy 83-84) states Northern agrees to
pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of
... bodily injury or
... property damage
to which this insurance applies, caused by an occurrence....
*198 Under Policy 80-83, the only "designated premises" was B & L's business office on Marine View Drive. The trial court based its decision finding coverage on the "business of the named insured conducted at or from the insured premises" language, and the fact the evidence established the landfill operations were conducted from the B & L offices.
The trial court correctly determined the landfill was covered under Policy 80-83. Under Policy 80-83's plain language, the insured (i.e. the average purchaser of insurance) would have understood Policy 80-83 to cover operations conducted "from" Marine View Drive. As the issue was raised on Northern's motion for summary judgment, the evidence when viewed in the light most favorable to Fjetland, leads us to conclude that the landfill operations were conducted "from" the Marine View Drive offices.
As to the trial court's ruling as to Policy 83-84, our disposition of the issues on appeal renders it moot. As such, we need not address the arguments concerning it.

II
Both parties object to the jury instructions given concerning the "occurrence" clause (i.e. the date of Fjetland's expectation of property damage). The trial court instructed the jury to determine when Fjetland "expected" contamination from "arsenic." Though it did not provide a definition of "expected," it did instruct the jury this is a subjective inquiry upon which Fjetland had the burden of proof.
Generally, the number and specific language of jury instructions are matters within the trial court's discretion. Instructions are sufficient when they permit a party to argue that party's theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law. If these requirements are met, it is not error to refuse to give a detailed augmenting instruction.[10]
Northern argues the trial court erred in two ways. First, it erred by instructing the jury to determine when Fjetland expected "arsenic" contamination rather than instructing it to determine when Fjetland expected "any type" of contamination. Second, it erred by using the term "expected," rather than "unexpected", and failing to define "unexpected."
Northern argues that the relevant question was when Fjetland "expected" any contamination (from woodwaste or slag) rather than when Fjetland expected contamination as a result of arsenic leaching from slag. This argument also surfaces with regard to the pollution exclusion. However, under the policies, Northern agreed to pay for damages for which Fjetland was "legally obligated." In the CERCLA trial, Fjetland was found liable to pay for the clean-up of damages relating to arsenic leaching from slag, expressly not woodwaste leaching. Fjetland cites a number of environmental cases where the courts have noted the issue is whether the insured "expected" the contamination which resulted in legal liability to support his argument that potential woodwaste contamination was irrelevant.[11]
Fjetland has the better of the two arguments. Legally, pursuant to the CERCLA judgment, Fjetland is obligated to pay for the clean-up of arsenic contamination at the landfill. Factually, there is no evidence woodwaste was the cause of the arsenic contamination at the landfill. Further, the Supreme Court in Queen City Farms instructs us that the insured must establish that "damage" was neither expected nor intended. There was no testimony that even if there was leachate from woodwaste that it was harmful. The "damage" was from the arsenic contamination alone. The trial court did not err in instructing the jury as it did.
Northern's other argument"expected" versus "unexpected"is meritless. The *199 "occurrence" clause of Policy 80-83 provided coverages for damages which were "neither expected nor intended." The trial court instructed the jury to determine when damages were "expected." Northern has not explained how it was prejudiced by the use of "expected" rather than "unexpected." Instructing in this manner did not prevent Northern from arguing its theory of the case. Furthermore, as instructing the jury "is not a matter of semantics," and the particular language of the instructions is left to the trial court, the jury was not mislead as to its function and responsibility under the law.[12] The trial court did not err by instructing in this manner.
For the same reason, the trial court did not err in refusing to further define the term "expected." Taken as a whole, the jury instructions permitted both parties to argue their theories of the case, were not misleading, and properly informed the jury on the applicable law. Though the instructions did not define "expected," they did instruct the jury that Fjetland had the burden of proof by a preponderance of the evidence on this issue. As a trial court does not err when it refuses to give a detailed augmenting instruction,[13] the trial court did not err in refusing to further define the term "expected."

III
Northern next argues the trial court erred in two ways concerning the "pollution" clause. First, it erred by finding the "pollution" clause contained a scienter requirement (i.e. that Fjetland knew the contaminating nature and extent of the pollution). Second, it erred by failing to instruct the jury as to the existence and terms of the "pollution" clause.
Northern's first argument is that under the "pollution" clause, it only had to show Fjetland was discharging material into the landfill (i.e. the action), not that he expected or intended the later-discovered contamination (i.e. the result). This argument fails in light of Queen City Farms, which held "sudden and accidental" means "unexpected and unintended."[14] Under this analysis, the issue is when the insured "expected" damage (i.e. the result); a clear scienter requirement. The court went on to hold that if the damage results from the dispersal of material from a place of containment where "the insured believed they would remain or ... be safely filtered, and that dispersal was unexpected and unintended," coverage is provided.[15] Given this holding, the trial court here did not err.
Likewise, the trial court did not err in failing to instruct as to the existence and terms of the "pollution" clause. The appellate court decision Queen City Farms (upon which the trial court relied), had held there were no factual issues concerning the "pollution" clause which differed from the issues concerning the "occurrence" clause. Though it did so on slightly different reasoning, the Supreme Court affirmed this opinion holding the issue was the insured's subjective expectations. The focus under the occurrence clause is the expectation of damage and the focus under the pollution clause is expectation of a polluting event resulting in damage.[16]
Northern argues that knowledge of the possibility of escapement of what Fjetland was dumping alone triggers the pollution clause exclusion, regardless of whether it was harmful. Northern was prohibited from offering any evidence about when Fjetland expected discharge from the disposal site; it asks for a new trial to explore this area. But it admits that the inquiry is only relevant if we hold that a knowledge of any type of escapement from the landfill satisfies the *200 knowledge requirement. We disagree that the case need be retried and we base our holding upon Queen City Farms and Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.[17]
In Queen City Farms, the Supreme Court indicated that the purpose of the pollution exclusion clause and the occurrence clause was to preclude coverage for damage resulting from intentional pollution or "pollution which is expected".[18] The court also concluded that in interpreting the exclusionary language the average purchaser would understand it to mean: "The originating source of the damage must be the `discharge, dispersal, release or escape' of pollutants or contaminants. Thus, the exclusion focuses on certain damage causing events."[19] We note also that throughout the opinion reference is made to the expectation that the product may be "safely filtered."[20] Also, in Key Tronic, the court further explained what the average purchaser of insurance would have been justified in thinking: "that insurance coverage was provided where business wastes were deposited in a sanitary landfill which was believed would contain the waste or safely filter it."[21] The court stated clearly: "Where the escape, and the resulting damage, was not expected, the loss would be reasonably understood by the average purchaser of insurance to fall within the broad coverage of a comprehensive general liability policy."[22]
In this case, we hold that Fjetland need have knowledge of damaging leachate, not just that there would be drainage or runoff. Thus, the issues are the same for the occurrence and pollution clauses, just as the Supreme Court noted that in some cases they might be.[23] Here, the jury was instructed to determine Fjetland's subjective expectation. Under the facts of this case, Fjetland could not have expected the polluting event before he expected property damage, and thus the distinction between the property damage and the polluting event is immaterial. The expectation of the polluting event occurred at the same time as the expectation of property damage. The instructions were correct and, as noted above, the instructions as a whole were sufficient to allow both parties to argue their theory of the case and were not misleading. In light of our holding, the trial court did not err on these facts, and the matter does not need to be remanded for a new trial.

IV
The trial court "apportioned" damages between what it considered to be the relevant damage period (i.e. January 1, 1981 to April 19, 1987) and the two applicable Northern insurance policies (i.e. August 1980 to August 1981 and August 1981 to August 1982). In so doing, the trial court effectively determined Northern was only obligated to pay two-sevenths of the eventual clean-up costs (which have yet to be determined), up to the limits of each policy.
Both parties object to this ruling. Fjetland argues "apportionment" is inappropriate and relies mainly on the "occurrence" clause, which obligated Northern to
pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of
... bodily injury or
... property damage
to which this insurance applies, caused by an occurrence....
(Emphasis added.)
Further, Fjetland notes that the "occurrence" clause includes in its definition "continuous or repeated exposure." Northern wishes to pay only for the damage which *201 occurred during its policy period and regards the policy period as its scope of exposure. Northern wishes to rely upon language in the policy which defines "property damage" as: "physical injury to or destruction of tangible property which occurs during the policy period." (Emphasis added.)
Fjetland's argument is that under the language of the policies Northern agreed that, if any property damage occurs during a covered period (i.e. a triggering event), Northern would pay "all sums" Fjetland must pay relating to property damage. Fjetland relies upon Gruol Constr. Co. v. Insurance Co. of North Am.[24] There, various insurers at different periods of time had insured a building. Eventually, dry rot damage was discovered and the insured attempted to collect under the various policies. The court held:
In a dispute between an insured who has sustained damages of a continuing nature, and the insurance carriers providing coverage, the burden of apportionment is on the carriers. The question turns on whether the damage is joint and several. Here, the trial court properly found joint and several liability. The damage, though continuing over a period of time, constituted a single injury.[[25]]
As such, each insurer was obligated under each policy.
In Monsanto Co. v. C.E. Heath Compensation & Liab. Ins. Co.,[26]Gruol was cited as stating the majority rule "holding insurers liable jointly and severally rather than on a pro rata basis." In Monsanto, the insured sought coverage from several insurers for claims relating to pollution damage which had occurred over multiple policy periods. The trial court apportioned coverage between the insurers based upon length of coverage. The insured appealed, arguing that "under the majority rule of joint and several liability, each insurance company whose policy coverage is applicable must pay `all sums' to the policy holder and, thereafter, seek contribution from the other insurance companies."[27]
The Supreme Court of Delaware agreed with the insured. It noted the "all sums" and "during the policy period" language, and held:
A policy is activated by bodily injury or property damage that takes place "during the policy period." The triggering language... does not define the extent of coverage. Once a policy is on the risk, the unambiguous policy language requires the insurance company to pay "all sums" for which the policyholder shall become liable, up to the policy limits....
The majority of courts have held that without a pro rata clause in the policies, the insurance companies cannot limit their obligations to a pro rata or portion of [the insured's] liabilities.[[28]]
Fjetland may seem to benefit because he only paid two years of premiums and received seven years of coverage. However, we hold that the provision is at least ambiguous. If the insurer wanted to only be liable on a "pro rata" basis, then it could have easily limited the coverage by including that languagehere, it states that it will pay "all sums" from an "occurrence" while conceding that an occurrence may take place over a period of time. Gruol and Monsanto are reasonable interpretations of policy language in situations where damage occurs over multiple policy periods. Though Northern cites a number of cases supporting a different proposition (i.e. limiting liability only to time policies that were in effect on pro rata basis), nothing it cites directly contravenes the Washington law as stated by Gruol. Though Northern's interpretation may be reasonable, that would mean that there are two reasonable interpretations of the policy language. In such a situation, the interpretation most favorable to the insured applies.[29] Applying that interpretation here, we must find that *202 the trial court erred in apportioning damages.

V
Northern argues the trial court erred under ER 804(b)(1) in admitting Fjetland's CERCLA deposition. As to Fjetland's deposition testimony, the trial court held that Northern had "incorporated" it into depositions in this case and as such had "waived" any objection. As to unavailable witnesses such as Fjetland, ER 804(b)(1) provides:
Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
Northern was not a party to the CERCLA action and thus was not present at Fjetland's deposition in that case. However, Northern was present at the deposition in this case. During the deposition of Fjetland in this case, another insurer had Fjetland "adopt" his earlier deposition testimony, and then made it an exhibit to the record. Northern chose not to question Fjetland concerning issues raised in the CERCLA deposition (or apparently any questions at all).
We review a trial court's decision to admit evidence under ER 804(b)(1) for an abuse of discretion.[30] The pertinent question here is whether Northern had an "opportunity" to develop the CERCLA deposition testimony by cross examination. In Hendrix v. Raybestos-Manhattan, Inc.,[31] when deposition testimony was offered at trial, a party who failed to cross-examine the witness at the deposition claimed it did not have an opportunity or motive to develop the witness' testimony. The court rejected the argument. It held: "as a general rule, a party's decision to limit cross-examination in a discovery deposition is a strategic choice and does not preclude his adversary's use of the deposition at a subsequent proceeding."[32]
Here, Northern had an opportunity to develop the CERCLA deposition by cross examination. It had the opportunity to question Fjetland concerning any statements he had made during that deposition. It also had an opportunity to develop further testimony on points raised, or not raised, during the CERCLA deposition. Northern chose not to make any inquiry at the deposition in this case, and in so doing, "took a calculated risk".[33] Though the issue is somewhat different in that Northern did not have an opportunity at the time the CERCLA deposition was taken to develop Fjetland's testimony, there is no such temporal requirement in ER 804(b)(1), nor does Northern cite any authority to support the proposition there is such a requirement. As such, the trial court did not abuse its discretion in allowing Fjetland's deposition testimony.

VI
Finally, Northern objects to the award of $133,911.99 in attorney's fees to Fjetland. The trial court based its award of attorney's fees on Olympic S.S. Co. v. Centennial Ins. Co.,[34] which states: "we believe that an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue."[35] In Dayton v. *203 Farmers Ins. Group,[36] the court determined this rule did not apply when the insurer denies a claim, but does when the insurer denies coverage. An insurer denies coverage when it denies a contractual duty to pay regardless of whether the facts needed to support the insured's claim are proved.[37]
The trial court properly determined Fjetland was entitled to an award of attorney's fees. Under Olympic S.S. and its progeny, he was forced to pursue litigation against Northern to have Northern honor its policies with him. Northern was not simply denying his claim, it was denying it had a contractual duty to provide any coverage at all. This suffices.
Once an entitlement to attorney's fees is established, a trial court has broad discretion in determining the amount of attorney's fees to be awarded, so long as that award is reasonable. Reasonableness is reviewed under the abuse of discretion standard.[38]
Here, the trial court reviewed the voluminous billing statements presented by Fjetland and awarded a portion, albeit a large portion (i.e. 70%), of those requested fees. The trial involved a large number of parties and attorneys, and various complex and technical insurance contract interpretation issues. Each party filed numerous memoranda and engaged in extensive research, preparation and argument. The trial court was in the best position to determine the value of this time, and did so in awarding Fjetland partial attorney's fees. The trial court did not abuse its discretion. As well, we hold that Respondents/Cross-Appellants are entitled to attorney's fees on appeal based upon Olympic S.S.

VII
The above discussion of Northern's claims also adequately addresses the bulk of Fjetland's claims on his cross-appeal. One issue, however, requires brief attention. The trial court did not abuse its discretion in excluding certain testimony of a WDOE employee. The information the employee would have imparted had not been communicated to Fjetland and thus did not bear on the issue at trial: i.e. Fjetland's subjective expectation.
We affirm on all grounds other than apportionment, which we reverse.
HOUGHTON, Acting C.J., concur.
WIGGINS, J. Pro Tem., dissents and files opinion.
WIGGINS, Judge Pro Tem. (dissenting).
I concur with the majority opinion except for Part IV, which imposes on Northern the entire cost of remediation despite the fact that Northern's policy was only in effect for a short part of this time. Northern insured Fjetland against "property damage," defined as "physical injury to or destruction of tangible property which occurs during the policy period." (Emphasis added.) The evidence showed that damage was continuous at least through the commencement of remediation in June 1992. The evidence also showed that damage occurred in roughly equal amounts each year, or else increased after the period of Northern's insurance coverage. I agree with the trial judge that the policy required that damage be apportioned throughout the period. Therefore, I respectfully dissent from the majority's decision to reverse the trial judge and impose this entire liability on Northern.
The beginning point for analyzing coverage under any insurance policy is the language of the policy. Northern agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence." Substituting the definition for "property damage" into this clause, Northern agreed to
pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ...

*204 [physical injury to or destruction of tangible property which occurs during the policy period] to which this insurance applies, caused by an occurrence.
I conclude from this language that Northern must pay only for damage which occurs during the policy period.
Instead of analyzing the policy language, the majority discusses joint and several liability, relying on Gruol Constr. Co. Inc. v. Insurance Co. of North America[39] and Monsanto Co. v. C.E. Heath Comp. & Liability Ins. Co.[40]Gruol is readily distinguished from this case. There three successive insurers provided uninterrupted insurance coverage during the six-year period at issue. The insured was clearly entitled to full insurance coverage. The insurers there sought to avoid any liability by shifting to the insured the burden of apportioning the damages among the three insurers. The court held that where the insured was clearly entitled to full insurance coverage the insurance carriers themselves are jointly and severally liable. The Gruol analysis does not resolve this case because the insuredFjetlanddid not maintain insurance coverage throughout the period of the damage.
Gruol is also distinguished by the fact that the court regarded the injury in that case as a single injury. Thus, the court imposed joint and several liability on all liable parties. But here, the trial court held that Northern had presented sufficient evidence upon which the damages could be segregated. Thus, instead of imposing joint and several liability, the court could render a fairer decision by apportioning the damages.
Gruol relied on the earlier decision in Fugere v. Pierce[41], which considered whether to apportion the injury caused by successive automobile collisions resulting in a single injury to the plaintiff. Fugere did not hold that such injuries could not be apportioned, but only that the burden was on the two defendants to apportion, and if the evidence did not allow apportionment, then the defendants would be jointly and severally liable:
[I]n a multiple impact situation, where the conduct of two or more automobile drivers combines to bring about harm to the plaintiff, the burden of proving that the harm can be separated falls upon those defendants who contend that it can be apportioned.
If there is competent testimony, adduced either by plaintiff or defendant, that the plaintiff's injuries are factually and medically capable of apportionment, and that they may be allocated with reasonable certainty to the individual impacts, the apportionment becomes a question for the jury.[42]
Fugere, like Gruol, is premised on the fact that several defendants are liable for the entire damage. It is logical to impose on the defendants the burden of apportioning among themselves the liability for the injury, and holding them jointly and severally liable if they fail to apportion. But here, Northern is only liable for part of the damage and Fjetland for the balance. Northern and Fjetland cannot be "jointly and severally liable" to Fjetland. Rather, Fjetland can only recover from Northern that portion of the damage for which Northernnot Fjetland is liable. In any event, the trial judge found that the evidence permitted apportionment of the damage. Even Gruol and Fugere require apportionment if the evidence permits it. Thus, Gruol does not support the majority.
Nor is the majority opinion supported by the Delaware case it cites, Monsanto Co. v. C.E. Heath Comp. & Liability Ins. Co. Monsanto turned on the language of the insurance policy at issue, which was totally different from the policy language in this case. There the insured agreed to pay
for damages, direct or consequential and the expenses, all as more fully defined by the term "ultimate net loss" on account of *205 ... Property Damage ... caused by or arising out of each occurrence.[43]
The policy defined an "occurrence" as:
An accident or happening or event or continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period.[44]
The court held that once an event resulted in injury or damage during the policy period, the insurer was obligated to pay all property damage caused by the occurrence. Northern, by contrast, defined "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period." Given this critical difference in the policy language, Monsanto does not help resolve this case.
I cannot find the ambiguity that the majority perceives in Northern's policy. The majority interprets the policy to mean that "it states that it will pay `all sums' from an `occurrence' while conceding that an occurrence may take place over a period of time."[45] But Northern did not agree to pay "all sums from an occurrence." Rather, it agreed to pay all sums which the insured became obligated to pay for "physical injury to or destruction of tangible property which occurs during the policy period" caused by an occurrence. It is not reasonable to interpret this language to mean that Northern agreed to pay for all property damage so long as some of the property damage occurred during the policy period. The policy is not ambiguous.
I agree with the majority that Fjetland "may seem to benefit because he only paid two years of premiums and received seven years of coverage." But the language of the policy simply does not confer this benefit on Fjetland. I would affirm the trial court and therefore respectfully dissent.
NOTES
[1] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.
[2] Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha, 126 Wash.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994); Kish v. Insurance Co. of North Am., 125 Wash.2d 164, 170, 883 P.2d 308 (1994); Public Util. Dist. No. 1 of Klickitat County v. International Ins. Co., 124 Wash.2d 789, 881 P.2d 1020 (1994); Weyerhaeuser Co. v. Aetna Casualty & Sur. Co., 123 Wash.2d 891, 897, 874 P.2d 142 (1994); Mutual of Enumclaw Ins. Co. v. Jerome, 122 Wash.2d 157, 160-61, 856 P.2d 1095 (1993); Boeing Co. v. Aetna Casualty & Sur. Co., 113 Wash.2d 869, 877, 881, 784 P.2d 507 (1990).
[3] McDonald v. State Farm Fire & Casualty Co., 119 Wash.2d 724, 733, 837 P.2d 1000 (1992).
[4] Queen City Farms, 126 Wash.2d at 67-69, 882 P.2d 703, 891 P.2d 718; International Ins., 124 Wash.2d at 797, 881 P.2d 1020; Weyerhaeuser Co., 123 Wash.2d at 897, 874 P.2d 142.
[5] Kish, 125 Wash.2d at 170, 883 P.2d 308; Lynott v. National Union Fire Ins. Co. of Pittsburgh, Pa., 123 Wash.2d 678, 691, 871 P.2d 146 (1994); Rodriguez v. Williams, 107 Wash.2d 381, 384, 729 P.2d 627 (1986).
[6] Queen City Farms, 126 Wash.2d at 59-60, 882 P.2d 703, 891 P.2d 718.
[7] Queen City Farms, 126 Wash.2d at 74, 882 P.2d 703, 891 P.2d 718.
[8] Queen City Farms, 126 Wash.2d at 72, 882 P.2d 703, 891 P.2d 718.
[9] Queen City Farms, 126 Wash.2d at 90-91, 882 P.2d 703, 891 P.2d 718.
[10] Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 165, 876 P.2d 435 (1994); Leeper v. Department of Labor and Indus., 123 Wash.2d 803, 809, 872 P.2d 507 (1994) (quoting Douglas v. Freeman, 117 Wash.2d 242, 256-57, 814 P.2d 1160 (1991)).
[11] See, e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 709, 607 N.E.2d 1204, 1222 (1992).
[12] Adams v. Department of Labor and Indus., 74 Wash.App. 626, 631, 875 P.2d 8 (1994) (citing State v. Hayes, 73 Wash.2d 568, 572, 439 P.2d 978 (1968)), aff'd, 128 Wash.2d 224, 905 P.2d 1220 (1995).
[13] Havens, 124 Wash.2d at 165, 876 P.2d 435.
[14] Queen City Farms, 126 Wash.2d at 90-91, 882 P.2d 703, 891 P.2d 718.
[15] Queen City Farms, 126 Wash.2d at 91, 882 P.2d 703, 891 P.2d 718 (emphasis added).
[16] Queen City Farms, 126 Wash.2d at 87, 882 P.2d 703, 891 P.2d 718.
[17] 124 Wash.2d 618, 881 P.2d 201 (1994).
[18] Queen City Farms, 126 Wash.2d at 87, 882 P.2d 703, 891 P.2d 718.
[19] Queen City Farms, 126 Wash.2d at 77, 882 P.2d 703, 891 P.2d 718 (emphasis added).
[20] Queen City Farms, 126 Wash.2d at 79, 91-92, 882 P.2d 703, 891 P.2d 718.
[21] Key Tronic, 124 Wash.2d at 628, 881 P.2d 201 (emphasis added).
[22] Key Tronic, 124 Wash.2d at 628, 881 P.2d 201.
[23] Queen City Farms, 126 Wash.2d at 89, 882 P.2d 703, 891 P.2d 718.
[24] 11 Wash.App. 632, 524 P.2d 427, review denied, 84 Wash.2d 1014 (1974).
[25] Gruol Constr., 11 Wash.App. at 637-38, 524 P.2d 427 (citations omitted).
[26] 652 A.2d 30, 35 n. 6 (Del.1994).
[27] Monsanto, 652 A.2d at 31 n. 1.
[28] Monsanto, 652 A.2d at 34-35 (footnote omitted).
[29] Queen City Farms, 126 Wash.2d at 67-69, 882 P.2d 703, 891 P.2d 718.
[30] In re Estate of Foster, 55 Wash.App. 545, 554, 779 P.2d 272 (1989), review denied, 114 Wash.2d 1004, 788 P.2d 1079 (1990); see also Dykes v. Raymark Indus., Inc., 801 F.2d 810, 817 (6th Cir.1986), cert. denied, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).
[31] 776 F.2d 1492 (11th Cir.1985).
[32] Hendrix, 776 F.2d at 1506.
[33] Hendrix, 776 F.2d at 1506.
[34] 117 Wash.2d 37, 53, 811 P.2d 673 (1991).
[35] Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673. See also International Ins., 124 Wash.2d at 814, 881 P.2d 1020; State Farm Mut. Auto. Ins. Co. v. Johnson, 72 Wash.App. 580, 594, 871 P.2d 1066, review denied, 124 Wash.2d 1018, 881 P.2d 254 (1994) (noting the "specificity of the rule" and "absence of any limitations").
[36] 124 Wash.2d 277, 876 P.2d 896 (1994).
[37] Mailloux v. State Farm Mut. Auto. Ins. Co., 76 Wash.App. 507, 516-17, 887 P.2d 449 (1995).
[38] Progressive Animal Welfare Soc'y v. University of Wash., 114 Wash.2d 677, 688, 790 P.2d 604 (1990).
[39] 11 Wash.App. 632, 524 P.2d 427, review denied, 84 Wash.2d 1014 (1974).
[40] 652 A.2d 30 (Del.1994).
[41] 5 Wash.App. 592, 490 P.2d 132 (1971).
[42] Fugere, 5 Wash.App. at 599, 490 P.2d 132.
[43] Monsanto, 652 A.2d at 33.
[44] Monsanto, 652 A.2d at 33.
[45] Majority opinion at 200-01.