837 A.2d 1149 (2003)
365 N.J. Super. 58
CYCLE CHEM, INC., Plaintiff-Appellant,
v.
LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant-Respondent, and
Great Southwest Fire Insurance Co., Lumber Mutual Insurance Company, St. Paul Fire & Marine Insurance Company and Allstate Insurance Company, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted September 23, 2003.
Decided December 30, 2003.
*1150 Kelly & Roth, attorneys for appellant (Mark C. Kelly, New York, NY, on the brief).
Tressler, Soderstrom, Maloney & Priess, attorneys for respondent Lumbermens Mutual Casualty Company (Albert C. Hilber, Newark, on the brief).
Before Judges SKILLMAN, COBURN and WELLS.
The opinion of the court was delivered by WELLS, J.A.D.
Plaintiff, Cycle Chem, Inc., (Cycle Chem), appeals from the entry of a final judgment that dismissed its declaratory judgment action seeking coverage under two policies of insurance issued by the defendant, Lumbermens Mutual Casualty Company (LMC). The judgment under appeal came upon LMC's motion for summary judgment which the judge granted.
From the late 1960's to the mid-1980's, Cycle Chem[1] distilled, sold, and distributed chemical solvents for use in dry cleaners and various types of manufacturing operations. During that time, Cycle Chem owned, operated, and insured only one premises, located at 217 South First Street, Elizabeth, New Jersey. It purchased from LMC two special multi-peril (SMP) insurance policies7HT 096 835, effective May 1, 1977 to May 1, 1980, and OHT 096 835, effective May 1, 1980 to May *1151 1, 1982. Each of the policies contained the following insuring clause:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage.... [Emphasis added.]
The policies provided limits of $500,000 each occurrence for property damage and $1 million each occurrence for bodily injury. Cycle Chem also purchased policies from other insurance carriers.
Several property owners and municipalities brought actions against Cycle Chem, alleging that chemical solvents distributed by Cycle Chem caused water and soil contamination. In addition, Cycle Chem was identified as a potentially liable party in administrative actions to compel the remediation of Superfund sites located in Carlstadt and Edison, New Jersey and Elkton, Maryland. The foregoing claims precipitated Cycle Chem's declaratory judgment action.
Neither Cycle Chem nor LMC have been able to locate or produce the policies at issue. Following a hearing on the issue, the parties were, nonetheless, able to arrive at stipulations to much of the contents thereof. In addition to the insuring clause quoted above, the parties agreed that both policies contained a special multi-peril (SMP) jacket cover, and that policy number 7HT 096 835 contained SMP liability insurance coverage form MLB-200, now MP-200. A 1977 circular issued by Insurance Services Office, Inc. (ISO)[2] describes MP-200 as a premises-operations form that "provides a combined single limit for bodily injury, property damage and optional coverage for medical payments at a declared premises." Policy number 0HT 096 835 contained a similar premises-operations form.
In addition, the parties stipulated that classification code 65121 was listed on both policies. Code 65121 is an ISO general liability classification code for "Buildings or Premisesoffice." According to Cycle Chem's expert, Richard Biondi, an ISO classification code provides a premium rate, which when multiplied by the square footage of the premises being insured, yields the premium for basic limits coverage.
LMC charged a premium of $154 for policy number 7HT 096 835 and $208 for policy number 0HT 096 835. It is not clear whether the above premiums were charged on an annual basis or whether they covered the entire policy period.
On August 5, 1980, Cycle Chem submitted a certificate of insurance to the New Jersey Department of Environmental Protection (DEP) in response to a request for "evidence of the establishment of financial responsibilities arising out of injury to persons or property."[3] The certificate was *1152 prepared by its agent, Americas Insurance Center (AIC), and listed LMC as a company affording comprehensive general liability coverage. The president of AIC later testified that, in the normal course of business, AIC sends a copy of the certificate of insurance to the insurer for purposes of inspection and verification.
On June 6, 1993, plaintiff Cycle Chem, Inc. filed a complaint in the Superior Court, Union County, against five liability insurance providers. The complaint sought a declaration that the insurers had a duty to defend and indemnify Cycle Chem for the above environmental damage claims that had been asserted against it.
On September 30, 1996, LMC moved for summary judgment, alleging that the policies it issued to Cycle Chem did not provide coverage for environmental liabilities not related to their office operations. In his oral decision following argument on the motion the judge concluded:
I find that this policy, the code classification reflects a building, a premises office code and the coverage under the loss policy is limited to coverages arising out of an office operation, therefore, the LMC policy does not cover this issue.
Following that determination, Cycle Chem spent the next several years in negotiating and successfully settling with the other four carriers it had sued. To conclude the case, on July 25, 2002, the judge memorialized his now five-year old decision in a form of judgment. It is from that order that Cycle Chem appeals.
Cycle Chem's brief makes four points: (1) that the policies in question are ambiguous and thus should be construed in its favor; (2) that the policies should be construed to meet its reasonable expectations; (3) that the classification code used by the ISO does not limit the coverage; and (4) the policy language itself is broad enough to cover off-site environmental risks.
We reverse.

I
Because we agree with Cycle Chem's fourth point, we find it unnecessary to discuss the first two points. We discuss the third point because the trial judge relied, in part, on the classification code to arrive at his construction of the policy. We, however, reject the code as relevant to construing the policy in the face of the express language of the policy as argued in Cycle Chem's fourth point.
We note that both parties have departed from the four corners of their stipulations in seeking favorable inferences supporting their respective positions about the proper construction of the insuring clause. For instance, LMC argues that the classification code stipulated as part of the policies, upon which premium rates were based, operates to restrict the coverage provided in the policy issued to Cycle Chem. That code, 65121, was used by ISO for "Buildings or PremisesOffice."
The troubling part of this argument, however, and ultimately fatal to it, in our opinion, is that in the cases cited by LMC in support the policies contained what is described as a "Classification Limitation Endorsement." That endorsement provided:
Coverage under this contract is specifically limited to those classification codes listed in the policy. No coverage is provided for any classification code or operation not specifically listed in the coverage part of this policy.
The parties' stipulation does not provide that such a clause was included in the lost policies issued to Cycle Chem. In addition, the motion judge made no finding that such a clause was included in the lost policies. No case has been cited in which in the absence of a Classification Limitation Endorsement, an ISO classification code has been construed to limit policy *1153 coverage expressed in language using general descriptive terms capable of a broader and more inclusive reach than that suggested by the code.
Cycle Chem, also arguing beyond the stipulation, contends in response that one of the SMP forms included with its policy contained a clause which specifically provided:
The rating classifications herein, except as specifically provided elsewhere, do not modify any of the provisions of the policy.
However, in the absence of specific findings by the judge that either clause was contained in the policies, we conclude that the interpretation of the insuring language of the policy is not aided by the stipulated ISO classification code. For these reasons, we reject the judge's reliance on that code as a proper basis to construe the policy language.
Next, LMC argues that the undisputed facts surrounding the relatively low premiums Cycle Chem paid imply that the coverage provided under an OL & T policy was much more restricted than that afforded under its comprehensive general liability (CGL) policy for which a higher premium was charged.
Premiums have been used to elucidate the extent of coverage in some cases. LMC relies on Central Mut. Ins. Co. v. Elliott, 347 So.2d 812 (Fla.Dist.Ct.App.1977). In that case the plaintiff sued a shipper and its insurer for injuries allegedly sustained when an unsecured carton of furniture fell on him from a boxcar. Id. at 812. The insurer denied coverage and the defendant shipper cross-claimed asserting that coverage was available. Ibid. Holding for the insurer, the court reasoned that because the shipper had paid premiums only for owners', landlords' and tenants' liability insurance and not completed operations insurance, it was not entitled to coverage under the subject policy. Id. at 813. The court stated, "The completed operations hazard, which was not purchased by [the shipper], covered its liability exposure in the loading and unloading of [the boxcar].... In short, no premium; no coverage." Ibid.
We are, however, again not convinced that the premiums charged here contain a clue to the meaning of the insuring clause especially since the record does not establish exactly what coverages these lost policies provided and what, if any, exclusions existed. Unlike Elliott, it is unclear from the record whether plaintiff paid premiums only for owners', landlords' and tenants' liability insurance. For instance, the 1977 circular issued by ISO specifically states:
SMP Liability Insurance Form MP-200 provides a combined single limit for bodily injury, property damage and optional coverage for medical payments at a declared premises. The product hazard and completed operations hazard coverage may be deleted by the use of the appropriate monoline liability exclusion endorsement.
Once again, the judge made no findings on what liability exclusion endorsements, if any, were included in the lost policies and the stipulation does not mention the subject.

II
In contrast to the use of the classification code or the level of premiums to inform the interpretation of the policy language, we ground our approach to interpretation in the language of the policy itself. The language emphasized on pages 2 and 3 supra, requires LMC to pay such sums as the insured may become obligated to pay caused by (1) "an occurrence" and, either (2a) "arising out of the ownership, maintenance or use of the insured premises" or, (2b) "all operations necessary or incidental" to the insured's business "conducted *1154 at or from the insured premises." LMC invites us to ignore the second of what we determine to be two distinct and alternate undertakings: to cover occurrences arising out of necessary and incidental operations conducted at or from the insured premises.
LMC argues that in holding that a second aspect of coverage exists in its OL & T policy, we would eliminate any distinction between an OL & T policy and its CGL policy. We disagree. The latter insurance product, which LMC also offered in the market, simply provided coverage for any occurrence. Covered occurrences under a CGL policy need not be related to an insured premises but may happen anywhere and in any manner not excluded by other provisions, whereas the insuring language in this OL & T policy requires the occurrence to arise out of the ownership, maintenance or use of an insured premises or a necessary or incidental operation conducted at or from an insured premises. Thus, the existence of coverage is dependent upon a nexus between the occurrence and the insured premises. Several cases support this interpretation.
Leading among these cases is On Air Entertainment Corp. v. Nat'l Indem. Co., 210 F.3d 146 (3rd Cir.2000), in which the Third Circuit collated the cases construing language in OL & T policies insuring the ownership, maintenance or use of the insured premises and all "operations necessary or incidental thereto" into three groups: (1) those in which the court found the language protects only against liability arising out of the condition or use of the insured building and not from the nature of the operations conducted therein; (2) those in which the court found the language can cover the operations or activity conducted in the premises if the injury occurs on the insured premises; and (3) those in which the court found the language covers liability arising from accidents occurring off the premises if the injury has a sufficient nexus to the operations conducted on the insured premises. Id. at 150-51.
In that case the Court held it need not decide which group it agreed with because even if it were the third group, providing the most expansive coverage, there would be no coverage for liability for the off-site rape of an underage female by the host of a syndicated television teenage dance show. Ibid. The court concluded there was no connection to the operations of the insured producers of the show where the injury arose out of an unlawful social relationship. Id. at 152.
However, a federal district court in New Mexico found an obligation to indemnify a claim of injury following sexual abuse of children by a priest under an OL & T policy that provided for coverage for "damages"... caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto." The Servants of Paraclete, Inc. v. Great American Ins. Co., 857 F.Supp. 822, 835 (D.N.M.1994). In that case, the insured was a treatment center for pedophilia in New Mexico to which the Fall River, Massachusetts Diocese had sent the priest and the acts complained of took place off its premises. The judge held:
Great American cites a leading insurance treatise, 11 George J. Couch, Couch Cyclopedia of Insurance Law § 44:379 (1982) for the proposition that OL & T policies are limited to protection against liability arising from the "condition or use of the building as a building...." Id. at p. 551. The Court does not take so limited a view of the OL & T policy in question. Quite simply, if Great American intended its insured to understand that the policy only covered the physical condition of the Servants' facilities, it *1155 should have so stated. At a minimum, it should have omitted the language "and all operations necessary or incidental thereto ..." and limited coverage to accidents arising out of the "ownership, maintenance or use of the insured premises...." Any accident resulting solely from the physical condition of the facilities would be included within the more limited language. Great American's contention makes superfluous the language "and all operations necessary or incidental thereto...."
Great American also emphasizes the off-premises situs of the Porter plaintiffs' alleged injuries. The Court does not find this factor to be determinative of coverage. Coverage may exist under an OL & T policy for an off-premises accident. State Auto. & Cas. Underwriters v. Beeson, 183 Colo. 284, 516 P.2d 623 (1973) (en banc). In Beeson, a child on the street was struck by keys for a pickup truck which were thrown out of a third floor apartment house window. The keys were thrown by the apartment's real estate manager and the pickup truck was to be used to transport rugs from one apartment house owned by the insured to another. The court found that the keeping of the keys by the manager, and the act of throwing them out of the window, were "incidental" to the operation of the apartments. Therefore, even though the injury occurred off-premises, the OL & T policy provided coverage. Beeson, 516 P.2d at 625. Conversely, an on-premises injury does not always mandate coverage.... [T]he key is not whether the injury occurs on or off-premises; rather, it is whether there exists a sufficient connection between the injury and the insured's premises, including necessary or incidental operations on the premises.
[Ibid.]
In a case more factually allied with the present one, liability coverage was found protecting the owner of a copper smelter under language identical to that in the policies here at issue for its trucking of polluted slag to a nearby landfill owned by the smelter from its insured premises on Marine Drive in Tacoma, Washington. American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 82 Wash.App. 646, 920 P.2d 192 (1996). The Court reasoned:
Under Policy 80-83, the only `designated premises' was B & L's business office on Marine View Drive. The trial court based its decision finding coverage on the `business of the named insured conducted at or from the insured premises' language, and the fact the evidence established the landfill operations were conducted from the B & L offices.
The trial court correctly determined the landfill was covered under Policy 80-83. Under Policy 80-83's plain language, the insured (i.e. the average purchaser of insurance) would have understood Policy 80-83 to cover operations conducted `from' Marine View Drive. As the issue was raised on Northern's motion for summary judgment, the evidence when viewed in the light most favorable to [owner], leads us to conclude that the landfill operations were conducted `from' the Marine View Drive offices.

[Id. at 198.]
In light of The Servants of Paraclete and American Nat'l Fire, we hold that the language "arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises" is sufficiently clear and unambiguous to have precluded the entry of summary judgment in LMC's favor. The motion should have been denied and Cycle Chem given an opportunity at trial to demonstrate a sufficient factual nexus exits between its necessary and incidental operations at or from the insured premises and *1156 the occurrences out of which its alleged liability arose. Because Cycle Chem did not file a cross-motion for summary judgment, the record is bereft of detailed facts from which a declaration of coverage can be made based upon such a nexus.
Reversed and remanded for further proceedings.
NOTES
[1] Until 1987 Cycle Chem operated under the name of Perk Chemical Co. Our use of its current name is intended to cover actions under its prior name as well.
[2] ISO is an organization formed for the purpose of providing standardized policy language for the insurance industry.
[3] N.J.A.C. 7:26G-8.1 incorporates by reference 40 C.F.R. § 246.147(a), which provides in part:

An owner or operator of a hazardous waste treatment, storage, or disposal facility, or a group of such facilities, must demonstrate financial responsibility for bodily injury and property damage to third parties caused by sudden accidental occurrences arising from operations of the facility or group of facilities.