951 P.2d 250 (1998)
134 Wash.2d 413
AMERICAN NATIONAL FIRE INSURANCE CO., Plaintiff,
v.
B & L TRUCKING AND CONSTRUCTION CO., INC. a corporation; Eagle Trucking, Inc., a corporation; Camille M. Fjetland, as successor in interest to William K. Fjetland, deceased, and John Doe Fjetland, individually and as a marital community; and Executive Bark, Inc., a corporation, Respondents,
Northern Insurance Company of New York, a corporation, Petitioner.
No. 64435-7.
Supreme Court of Washington, En Banc.
Argued June 10, 1997.
Decided February 19, 1998.
*251 Williams, Kastner & Gibbs, Frankie Crain, Seattle, Wiley, Rein & Fielding, Thomas Brunner, Daniel Troy, Scott S. Harris, Laura Foggan, Washington, DC, for Petitioner.
Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Linda Young, Bradley Maxa, Tacoma, for Respondents.
Thomas James, Seattle, John Barry, Paul Janaskie, Washington, DC, on behalf of Insurance Environmental Litigation, Amicus Curiae.
William Hickman, Mary DeYoung, on behalf of American States Insurance Environmental Litigation, Amicus Curiae.
David Brenner, Seattle, Michael Lynch, Meryl Neiman, Pittsburgh, PA, on behalf of Puget Sound Energy, Inc., Amicus Curiae.
David Schoeggl, Linda Clapham, Tammy Lewis, Seattle, on behalf of Certain London Market Insurers, Amici Curiae.
Gabriel Gedvila, Weyehaeuser Co., Tacoma, Charles Gordon, Jeffery Tilden, Seattle, Eugene Anderson, Robert Horkovich, Peter Andrews, New York City, on behalf of Weyerhaeuser Co., Amicus Curiae.
JOHNSON, Justice.
This case presents the issue of whether pollution cleanup costs should be allocated between insurer and insured when the pollution occurred over many years and the insured was insured during only a portion of the entire polluting period. Eagle Trucking, Inc. and its owner, William Fjetland, were held liable in a CERCLA[1] action for a percentage of the cleanup costs of a contaminated landfill. Fjetland brought claims against its insurers seeking coverage for these costs. The trial court allocated costs between insured and one of its insurers, The Maryland/Northern Insurance Company of New York, on a pro rata basis. The Court of Appeals, however, held that because of ambiguity in the insurance policy language, costs may not be allocated. We affirm the Court of Appeals.

FACTS
Fjetland[2] operated several businesses, including Eagle Trucking and B & L Trucking & Construction (Fjetland). Fjetland hauled smelter slag from the copper smelter owned by Asarco Incorporated (Asarco) to the log yards in the Port of Tacoma. The slag was used as ballast for log export companies' yards. Although slag was once thought to be inert, experts later determined when ground up, mixed with wood waste, and exposed to water, it leached contaminants.
In 1978, Fjetland purchased the B & L Landfill site (Landfill), which is located in a wetlands area in Milton, Washington. Shortly after purchasing the property, Fjetland began hauling slag, mixed with wood waste, from the log yards to the Landfill. These materials were removed from log yards to the Landfill in order to make room for fresh materials, which provide new working surfaces for loading equipment and log storage. At the end of 1980, the Landfill was closed and the permit for the Landfill was withdrawn because of new legislation relating to the definition of wetlands and the filling of those lands. Fjetland continued to dump materials in the Landfill, but for purposes of contouring the land.
Throughout the years in question, Fjetland had purchased comprehensive general liability insurance (CGL insurance) from a number of insurance companies, including The Maryland/Northern Insurance Company of New York (Northern) and American National Fire Insurance (American National). Each policy issued by Northern lists as insureds, among others, both William Fjetland and Eagle Trucking. The policies were issued as follows: (1) an annual policy issued August 15, 1978 and canceled as of May 3, 1979 (Policy 78-79); (2) a policy issued August 11, 1980 through August 11, 1983, renewed annually *252 (Policy 80-83); and (3) an annual policy issued August 11, 1983 through August 11, 1984 (Policy 83-84). Other policies included Policy 84-85 from United Pacific and Policy 85-86 from American National.
High levels of arsenic and other metals were discovered around the Tacoma tideflats area in 1980 and testing of the Landfill in early 1982 revealed arsenic in the Landfill. In an action under CERCLA to determine allocation of remediation costs for the Landfill, the United States District Court determined liability as follows: Asarco would bear 79 percent; Murray Pacific (a log yard owner), 7 percent; William Fjetland, 7 percent; and Eagle Trucking, 7 percent. Another Fjetland entity, B & L Trucking, was found not liable. The court made clear it was not assessing liability against Fjetland or Eagle Trucking for pre-1981 activities and that slag, not wood waste, caused the damage.
As one of Fjetland's insurers, American National sought a declaratory judgment in state court that it was not responsible to cover contamination costs at the Landfill and also sought contribution and/or indemnity from Northern and other insurers. Northern cross-claimed, seeking a declaration of no coverage. Fjetland cross-claimed against all insurers. The trial court found the United Pacific policy did not afford coverage. Several parties were dismissed; some settled. Northern and Fjetland remain.
Prior to trial, Northern sought summary judgment on a number of issues. The trial court granted summary judgment for Northern as to liability under all policies that terminated before 1981, basing its decision on the United States District Court's ruling in the CERCLA action that Fjetland and Eagle Trucking had no liability prior to 1981. The trial court denied summary judgment for Northern that Policy 83-84 did not provide coverage because the Landfill was not listed as part of Fjetland's insured premises. Northern also sought a ruling that the pollution clause excluded coverage because Fjetland had intentionally discharged waste at the Landfill. The court denied the motion, finding there was a question of fact as to whether Fjetland had knowledge he was discharging waste materials.
Also, prior to trial, the court ruled on cross motions for summary judgment regarding whether remediation costs should be allocated between insurer and insured. Fjetland argued its insurers have a joint and several obligation to provide full coverage. Northern argued a proportionate share of the costs should be allocated between insured and uninsured periods and, therefore, Fjetland should share liability with its insurer. The court ruled the costs would be allocated equally on a pro rata/per year basis between insurer and insured based on insured and uninsured periods. Uninsured periods include the years following the month and year in which the jury determined the insureds expected property damage at the Landfill. In a separate ruling, the court determined the allocation period would begin January 1981 and end April 29, 1987, which is the date Fjetland received the cleanup order.
The case was then tried to a jury with the sole issue being whether Fjetland or Eagle Trucking "expected" damage at the Landfill and, if so, what was the earliest date of expected damage. The jury found Fjetland or Eagle Trucking expected damage as of June 1982. The trial court entered a declaratory judgment, incorporating its previous rulings on summary judgment motions and also ruling Northern had an obligation for coverage under Policy 80-83 for the period August 11, 1980 through August 11, 1981; Northern had an obligation for coverage under Policy 80-83 for the period August 11, 1981 through June 1982 (based on the jury's finding of "expected" damages); Northern had no obligation for coverage under Policy 82-83 and no obligation under Policy 83-84. Attorney fees were awarded Fjetland in the amount of $133,911.99. Northern was, therefore, obligated under its policies in effect between 1981 and June 1982 only and was liable for two-sevenths of the remediation costs.
The parties cross-appealed. The Court of Appeals affirmed most of the judgments of the trial court, but reversed the ruling regarding allocation. The court held the policy provisions of "occurrence" and the "pollution exclusion" had been met and, because of ambiguity in the policy language, there *253 should be no allocation of damages, even though Fjetland was insured during only a portion of the polluting period. American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 82 Wash.App. 646, 651, 920 P.2d 192 (1996). We accepted review of the allocation issue. The issue before us is whether pollution cleanup costs should be allocated between insurer and insured when the pollution occurred over many years and the insured was insured during only a portion of the entire polluting period.

ANALYSIS
Neither Northern nor Fjetland challenge the trial court's rulings regarding which policies provide coverage. The issue before us is not which policies are triggered, but rather, whether the triggered policies cover costs incurred after June 1982. This is solely an allocation issue and requires us to analyze the language of the policies. The triggered policies are Policy 80-81 and Policy 80-83 through June 1982.
Under the policies at issue, Northern insured Fjetland, stating:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. bodily injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence....
Clerk's Papers at 233.
"[P]roperty damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period....
. . . . .
"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured....
Clerk's Papers at 537.
Northern argues the plain language of the insurance policy limits Northern's liability to damage occurring during the policy period. Northern integrates the above policy language, inserting the definition of "property damage" into the occurrence clause and states it agreed only:
to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of physical injury to or destruction of tangible property which occurs during the policy period to which this insurance applies and is caused by an occurrence.
Pet. for Review at 8. Northern states because it can be responsible only for property damage occurring during the policy period, its liability ends when the triggered policy periods end.
Fjetland, on the other hand, relies on the all sums language of the occurrence clause and proposes the policy language should be interpreted in the following manner: if the insured's liability is "because of" property damage during the policy period, the insurer is then responsible for all sums the insured is legally obligated to pay. In other words, once a policy is triggered, that policy remains on the risk for continuing damage. Fjetland argues the policy is ambiguous with regard to coverage for continuing property damage because the policy language is susceptible to two reasonable interpretations, and therefore its own (the insured's) interpretation must prevail.[3]
The two seminal cases on the allocation issue are Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), and Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034 (D.C.Cir.1981). Forty-Eight Insulations held when an insured had periods during which it was uninsured, defense costs for occurrences taking place outside the policy period must be allocated between insurer and insured on a pro *254 rata basis. In disagreeing with the proposition that an insurer must bear all costs of defense whenever any policy is triggered, the Forty-Eight Insulations court found an insurer must bear the entire cost of defense only when there is no reasonable means of prorating the costs of defense between the covered and not covered items. Forty-Eight Insulations, 633 F.2d at 1224 (citing National Steel Constr. Co. v. National Union Fire Ins. Co., 14 Wash.App. 573, 543 P.2d 642 (1975)). Keene, on the other hand, held the insured must be able to collect from any insurer whose policy is triggered the full amount of indemnity due, subject only to the "other insurance" provisions. Keene, 667 F.2d at 1050. The Keene court stated its holding was consistent with one of our Court of Appeals decisions to allocate liability among insurers when more than one insurer covers a loss. Keene, 667 F.2d at 1050 (citing Gruol Constr. Co. v. Insurance Co. of N. Am., 11 Wash.App. 632, 524 P.2d 427 (1974)).
In Gruol, the Court of Appeals addressed a similar, although not identical, issue. An insured brought an action against an insurer for failure to defend against a contractor. Damage was caused to an apartment building by dry rot, which resulted from improper backfilling during construction. The court held the dry rot, as the resulting damage from the improper backfilling, was the "occurrence" for purposes of the insurance policy. Because the dry rot was continuous, coverage was proper against insurers whose policies covered the "occurrence," even though the initial negligent act of improper backfilling took place within the period of another insurance company's coverage. Gruol, 11 Wash.App. at 635, 524 P.2d 427. The Gruol court held when an insured sustains damages of a continuing nature, its insurers are jointly and severally liable. Gruol, 11 Wash.App. at 637-38, 524 P.2d 427. All insurers providing coverage during any portion of the total time period of the continuing damage were held liable for the total amount of the continuing property damage. We agree with Fjetland that Gruol stands for the proposition that all insurers on the risk during the time of ongoing damage have a joint and several obligation to provide full coverage for all damages. We also agree with the Keene court's finding that its holding is consistent with the Gruol decision.[4]
When we examine the case law on allocation, in conjunction with what type of trigger analysis is employed, the different results regarding this issue become clearer. For instance, in Villella v. Public Employees Mut. Ins. Co., 106 Wash.2d 806, 725 P.2d 957 (1986), we discussed Gruol and also cited to Keene and Forty-Eight Insulations in our discussion regarding triggering of coverage. The issue in Villella was whether a homeowner's policy covered damage occurring after the policy period when the process allegedly causing the damage began during the policy period, but the damage itself occurred later. We held there was no continuing process of damage to the residence, the policy required that damage occur during the policy period, and, therefore, the policy did not cover the damage. Villella, 106 Wash.2d at 812-14, 725 P.2d 957. In discussing Gruol, Keene, and Forty-Eight Insulations, we noted that under either the continuous damage theory adopted in Gruol or the triple trigger theory adopted in Keene, coverage under the occurrence clause requires the insured to sustain damage during the effective period of the policy. Villella, 106 Wash.2d at 814, 725 P.2d 957. In other words, when damage occurs during a policy period, that policy is triggered.
In Villella, we addressed the effect of continuing property damage on the triggering of insurance policies. In that case, we quoted Forty-Eight Insulations, which stated: "[W]hen courts are dealing with property *255 damage situations where damages slowly accumulate, courts have generally applied the exposure theory. So long as there is tangible damage, even if minute, courts have allowed coverage from that time." Villella, 106 Wash.2d at 814, 725 P.2d 957 (quoting Forty-Eight Insulations, 633 F.2d at 1222 n. 18). Hence, in Villella, we accepted that when damage is continuing, all triggered policies provide full coverage. Northern's argument that it can be held liable only for property damage occurring during the policy period is misguided. This argument addresses only which policies are triggered, not whether costs should be allocated, a point overlooked by the dissent.
In Queen City Farms, Inc. v. Central Nat'l Ins. Co., 126 Wash.2d 50, 882 P.2d 703 (1994), 891 P.2d 718 (1995), we discussed both the occurrence and pollution exclusion clauses in a case with facts similar to those in the case at hand. In Queen City Farms, a disposal pond leaked and contaminated groundwater. A declaratory judgment was sought to hold various CGL insurance policies liable for the costs of the cleanup. In discussing the occurrence clause, we held that for an occurrence to occur the harm must be "unexpected." No coverage is extended where the harm is expected or intended. Queen City Farms, 126 Wash.2d at 71, 882 P.2d 703. We also recognized that gradual polluting events fit within the occurrence clause, provided they are "unexpected or unintended." Queen City Farms, 126 Wash.2d at 86-88, 882 P.2d 703. In discussing the pollution exclusion, we stated the polluting event is the discharge, dispersal, release, or escape from the place of containment into or upon the land, the air, or the water, including groundwater. Queen City Farms, 126 Wash.2d at 79, 882 P.2d 703. We held that under the pollution exclusion clause, damage is not covered if it is "expected or intended." Queen City Farms, 126 Wash.2d at 87, 882 P.2d 703.
Northern and the dissent assert because the jury found that Fjetland "expected" damage as of June 1982, the policy precludes any recovery after that date and the Court of Appeals ruling effectively invalidates the jury's finding. This assertion, however, is based on an incorrect reading of the occurrence clause and a confusion of the pollution exclusion clause and allocation issues. The occurrence in this case is the continuing damage caused by the leaching, and the trial court determined which policies were triggered under the occurrence clause. Under the pollution exclusion language, Northern would not be liable for costs incurred because of intentional polluting. The pollution exclusion clause excludes damage arising from discharge of waste materials, but the exclusion does not apply if the discharge is "sudden and accidental." Under our decision in Queen City Farms, sudden and accidental means unexpected or unintended. Queen City Farms, 126 Wash.2d at 90, 882 P.2d 703. The jury's finding that Fjetland "expected" damage after June 1982 precludes the policies after that date from being triggered. It does not, as the dissent urges, preclude Northern's liability under the triggered policies for continuing damage.
As stated previously, the trigger of coverage is not before us. And the event that triggers coverage does not define the scope of the coverage. Rather, the question before us is: Once a policy is triggered by continuous damage, is damage covered under that triggered policy after the policy has expired or after damage is expected? Although the question of trigger and the question of allocation are separate, the rationale used to trigger the policy often points to the proper method of apportioning coverage between triggered policies. Kenneth S. Abraham, Environmental Liability Insurance Law 119 (1991). Under the terms of the relevant policies, an occurrence includes "continuous or repeated exposure to conditions."[5] Usually, when a continuous trigger is utilized, costs are not apportioned between triggered policies, but insurers, rather, are held jointly and severally liable. Abraham, supra, at 119.
Northern and the dissent argue we are dealing with uninsured years here. They *256 each contend if Fjetland is not held liable for a portion of the cleanup costs, he is essentially being awarded coverage for periods when he was not insured. As noted by the Court of Appeals and discussed below, if Northern intended solely to be liable on a pro rata basis it could have included that language in its policy. More importantly, however, when dealing with uninsured years, for allocation purposes, we are dealing with years that would be triggered if a policy were applicable in that year. Abraham, supra, at 126. No policies after June 1982 would have been triggered in this case because of the occurrence and pollution exclusion clauses. We are not dealing with uninsured years.
With these principles and the case law on allocation in mind, we now turn to an analysis of the policy language. In Washington, insurance policies are construed as contracts. Findlay v. United Pacific Ins. Co., 129 Wash.2d 368, 378, 917 P.2d 116 (1996). An insurance policy is construed as a whole, with the policy being given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994) (quoting Grange Ins. Co. v. Brosseau, 113 Wash.2d 91, 95, 776 P.2d 123 (1989)). If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. McDonald v. State Farm Fire & Cas. Co., 119 Wash.2d 724, 733, 837 P.2d 1000 (1992). If the clause is ambiguous, however, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Findlay, 129 Wash.2d at 374, 917 P.2d 116. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. Queen City Farms, 126 Wash.2d at 68, 882 P.2d 703; American Star Ins. Co. v. Grice, 121 Wash.2d 869, 878, 854 P.2d 622 (1993), supplemented on other grounds by 123 Wash.2d 131, 865 P.2d 507, 44 A.L.R.5th 905 (1994). A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable. Morgan v. Prudential Ins. Co., 86 Wash.2d 432, 435, 545 P.2d 1193 (1976).
Looking at the policy in light of our rules of construction, we find the language is, at the least, fairly susceptible to different, reasonable interpretations and is, therefore, ambiguous. If the insurer wished to limit its liability through a pro rata allocation of damages once a policy is triggered, the insurer could have included that language in the policy. See Monsanto Co. v. C.E. Heath Compensation & Liab. Ins. Co., 652 A.2d 30, 35 (1994) ("The majority of courts have held that without a pro rata clause in the policies, the insurance companies cannot limit their obligations to a pro rata share or portion of [the insured's] liabilities"). Here, there is no such language.[6] The average person purchasing insurance would construe the policy language to provide indemnity for an injury once the policy was triggered. Because the language is, at the least, ambiguous, and because we discern no extrinsic evidence from the record indicating an intent by both parties to exclude coverage, we must resolve the ambiguity in favor of the insured. American Star Ins. Co., 121 Wash.2d at 878, 854 P.2d 622 (where insurance policy exclusion is ambiguous and in absence of evidence showing an understanding that coverage was intended to be excluded, policy is construed to provide coverage). We hold that once a policy is triggered, the policy language requires insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits.[7] Once coverage is triggered in one or more policy periods, those policies provide full coverage for all continuing damage, without any allocation between insurer and insured. *257 See Aerojet-Gen. Corp. v. Transport Indem. Co., 17 Cal.4th 38, 948 P.2d 909, 70 Cal.Rptr.2d 118, 128 (1997) ("if specified harm is caused by an included occurrence and results, at least in part, within the policy period, it perdures to all points of time at which some such harm results thereafter") (emphasis added).
In Olds-Olympic, Inc. v. Commercial Union Ins. Co., 129 Wash.2d 464, 471, 918 P.2d 923 (1996), we stated:
[An] insurance obligation is interpreted in a fashion consistent with the undertaking described in the policy label. Insureds are not purchasing "almost comprehensive" coverage. CGL policies are marketed by insurers as comprehensive in their scope and should be strictly construed when the insurer attempts to subtract from the comprehensive scope of its undertaking.
Following this strict construction rule leads us to the result in this case that damages not be allocated between Northern and Fjetland.
Northern contends the Court of Appeals opinion violates principles of fairness and public policy because it provides a policyholder who purchases just one year of insurance the same protection as those who purchase insurance annually. This argument is without merit. Northern drafted the policy language; it cannot now argue its own drafting is unfair. Further, because insurance policies are considered contracts, the policy language, and not public policy, controls. We will not add language to the policy that the insurer did not include.[8] Instead, Northern agreed to pay "all sums" arising out of an "occurrence" which, by its own policy definition, may take place over a period of time.
Northern also cites Waite v. Aetna Cas. & Sur. Co., 77 Wash.2d 850, 467 P.2d 847 (1970) for the proposition that our case law permits allocation of liability between Northern and Fjetland. In Waite, however, we did not address this issue. Rather, in Waite, we concluded the trial court had a reasonable basis for allocating defense costs between insured and insurer because certain items claimed by insured under the policy were not covered claims but were excluded. Waite, 77 Wash.2d at 858-59, 467 P.2d 847. Here, we are not addressing the issue of allocation in the context of an uncovered claim.
Fjetland requests attorney fees for responding to Northern's appeal to this court. Attorney fees were awarded at the trial court. The Court of Appeals affirmed that award and awarded attorney fees on appeal based on Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991), which held an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract. Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673. Under Olympic S.S., attorney fees may also be awarded on appeal. Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673. We, therefore, award Fjetland attorney fees for this appeal in an amount to be determined by the Commissioner.
We affirm the Court of Appeals.
DOLLIVER, SMITH, GUY and TALMADGE, JJ., concur.
MADSEN, Justice (dissenting).
The majority requires the insurer in this case to provide insurance coverage it neither contracted to provide nor received insurance premiums for. In doing so, the majority nullifies the jury's determination that respondents expected the environmental damage as of June 1982. Under the majority's analysis, the jury's finding, which should preclude coverage for damage occurring after that date, simply does not matter. The majority also relies upon Washington case law which does not apply to the facts in this case. I would uphold the trial court's pro rata allocation of liability based upon time of the risk and, accordingly, dissent.
*258 Northern Insurance did not contract to provide the coverage the majority requires it to provide. In his dissenting opinion, Court of Appeals Judge Pro Tempore Wiggins correctly analyzed the relevant insurance contract language. Northern agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... destruction of tangible property to which this insurance applies and is caused by an occurrence...." Pet. for Review at 8. "[O]ccurrence" is defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured...." Clerk's Papers (CP) at 537. "[P]roperty damage" is defined as "physical injury to or destruction of tangible property which occurs during the policy period...." Id. The policy thus plainly provides that Northern must pay for "all sums which the insured shall become legally obligated to pay as damages because of" "physical injury to or destruction of tangible property which occurs during the policy period," which is "neither expected nor intended from the standpoint of the insured...." Pet. for Review at 8; CP at 537.
Contrary to the majority's analysis, it is not reasonable to construe the "all sums" language as meaning that the insurer has contracted for joint and several liability for the full amount of damages for the obvious reason "the sums the insurer is obligated to pay must be on account of property damage arising out of an occurrence during the policy period." Outboard Marine Corp. v. Liberty Mut. Ins. Co., 283 Ill.App.3d 630, 642, 219 Ill.Dec. 62, 670 N.E.2d 740 (1996) (emphasis added).[1] Because the language of the policy as a whole does not obligate the insurer to pay any and all sums regardless of when the property damage occurred and regardless of the relevant policy period, there is no ambiguity to be construed in favor of the insured and against Northern Insurance.
Further, the policy language plainly does not allow for coverage for property damage which is expected or intended by the insured. The jury determined that respondents expected such damage as of June 1982. Yet the majority's imposition of "joint and several" liability requires Northern to provide coverage for years after that date, when property damage was expected by the insured. The majority ignores the policy language and nullifies the jury's determination that respondents expected property damage as of June 1982.
Disregarding the jury's finding does not merely violate the language of the policy. Pollution may result from disposal practices thought to be sound at the time wastes are deposited at a site. See Queen City Farms, Inc. v. Central National Ins. Co., 126 Wash.2d 50, 78-79, 882 P.2d 703, 891 P.2d 718 (1995). Environmental pollution may also occur when it is unknown at the time of disposal that the materials pose an environmental risk. In either case, there may be an unknown loss in progress during a policy period which will require insurance coverage under a comprehensive general liability policy. However, where a loss in progress is known, covering liability poses a risk of moral hazard, that is, "the tendency of an insured party to exercise less care to avoid insured losses than that party would exercise if the losses were uninsured." Kenneth S. Abraham, Environmental Liability Insurance Law 21, 145 (1991). An insured who becomes aware of pollution damage has little incentive to respond and abate the condition if the insurer will be obliged to provide coverage for additional environmental damage occurring years after the policy period expires. The policy language precluding coverage where the damage is expected or intended serves to avoid this risk, and should be given effect.
To bolster its result the majority points to Gruol Constr. Co. v. Insurance Co. of N. Am., 11 Wash.App. 632, 524 P.2d 427 (1974), a case which simply does not apply under the facts presented here. In Gruol, dry rot in a residence caused by improper backfilling resulted *259 in continuing damage during successive periods of time when the structure was covered under three separate insurance policies. There were no periods of time in Gruol where coverage did not exist prior to discovery of the damage. The Court of Appeals held in Gruol that the damage, though continuing over time, constituted a single injury for which each insurer had contracted to provide coverage. Gruol, 11 Wash.App. at 637-38, 524 P.2d 427. The court held that in such circumstances in a dispute between the insurance carriers and the insured, the liability of the insurers was joint and several and "the burden of apportionment is on the carriers." Id. at 637, 524 P.2d 427. That holding makes sense because the insurers, collectively, were clearly liable for the total damage, and it was fair to require them to sort out which of them had to pay what proportion of the total rather than imposing that burden of proof on the insured.
Here, the period of liability for Mr. Fjetland and Eagle Trucking, Inc. is 1981 to April 29, 1987 (this time period is not challenged at this stage of the proceedings). In sharp contrast to Gruol where the undiscovered condition worsened over several policy periods, here there was no coverage after June 1982 because damage was expected as of that time. Quite unlike the situation in Gruol, in this case the insureds expected environmental damage for nearly five years of the relevant time period.
Moreover, the injury in Gruol was a single injury which worsened over several policy periods. Washington case law recognizes that the time of an occurrence for insurance coverage purposes is determined by when damage or injuries took place, as discussed in Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys., 111 Wash.2d 452, 465-70, 760 P.2d 337 (1988) (citing cases). In that case, the court also recognized that the number of events triggering coverage may depend upon the number of causes underlying the alleged damage and resulting liability. Id. at 467, 760 P.2d 337. Where environmental damage results from disposal of materials, property damage may result immediately, as, for example, where toxic materials are dumped into a lake or bay. Materials may also be disposed of in a sanitary landfill or waste disposal pit which was believed would contain or safely filter the material. In such a case, the escape of the materials from the place of containment may be the polluting event resulting in damage which is covered under a general comprehensive liability policy. See Queen City Farms, 126 Wash.2d at 76-79, 882 P.2d 703. Because seepage from a disposal site may not occur until well after material is deposited, and then may occur on an ongoing basis, conceptually there may be innumerable polluting events causing property damage through many policy periods. Rather than a single worsening injury, as in Gruol, the property damage in an environmental pollution case may be the result of continuous multiple polluting events as materials escape from a landfill into the environment over years.
In addition, there is no record of insurance provided by any carrier after 1986. As Judge Pro Tempore Wiggins noted, this fact, too, distinguishes Gruol, where the insured maintained coverage throughout the period of the damage. Although in Gruol it made some sense to analogize to the tort concept of joint and several liability, the joint and several liability rule of Gruol should not be applied where environmental damage occurs through both insured and noninsured periods. An insured should not be able to shift its responsibility for uninsured years to a carrier which did not contract to provide coverage for that period of time. Outboard Marine Corp., 219 Ill.Dec. at 70, 670 N.E.2d at 748. Many courts faced with circumstances like those presented here have held that loss should be allocated to uninsured periods. E.g., Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178 (2d Cir.1995); Northern States Power Co. v. Fidelity & Cas. Co. of N.Y., 523 N.W.2d 657 (Minn.1994); Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994); Sharon Steel Corp. v. Aetna Cas. & Sur. Co., 931 P.2d 127 (Utah 1997). The same principle has been applied where insurers' responsibility for defense costs has been at issue. E.g., Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980); Gulf Chem. & Metallurgical Corp. v. *260 Associated Metals & Minerals Corp., 1 F.3d 365 (5th Cir.1993); Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp., 685 F.Supp. 621 (E.D.Mich.1987).
As one court put it, if loss were to be allocated to periods of no insurance coverage, an insured "which had insurance coverage for only one year out of 20 would be entitled to [coverage] ... the same as [an insured] which had coverage for 20 years out of 20." Forty-Eight Insulations, 633 F.2d at 1225.[2] This court should align itself with those courts which have rejected this unfair result.
The "joint and several" liability rule of Gruol should not be applied in the circumstances of this case.
Courts have employed several methods of allocating loss occurring under multiple policies over multiple policy periods.[3] Here, the trial court allocated liability using a pro rata method based upon the years the insurer was on the risk. This method has been employed by other courts faced with a similar apportionment issue. E.g., Outboard Marine Corp., 219 Ill.Dec. 62, 670 N.E.2d 740; Stonewall Ins. Co., 73 F.3d 1178; Insurance Company of N. Am., 633 F.2d 1212; Northern States Power Co., 523 N.W.2d 657. The years-on-the-risk apportionment method is a reasonable method of allocation under the circumstances of this case for at least three reasons. First, the insurer contracted to provide for coverage for damage during the policy period and not for periods where another insurer provided coverage or where no coverage existed. Second, while insurers must be held to the obligations they undertake, it is unfair to require that they provide insurance for periods for which they have not contracted to provide coverage and for which they have received no premiums. Third, where the jury found that damage was expected as of June 1982, the years-on-the-risk method accounts for the fact that while environmental damage occurred after that date, the insured expected the damage.
Finally, the majority says that any unfairness in its result is Northern's fault, since it wrote the insurance policy at issue. I disagree. The unfairness resulting from the majority opinion results because the majority has rewritten the policy and misapplied Gruol, 11 Wash.App. 632, 524 P.2d 427.
I dissent. The trial court should be affirmed.
DURHAM, C.J., and ALEXANDER and SANDERS, JJ., concur.
NOTES
[1] Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601-9675.
[2] During the course of these proceedings, William Fjetland died; Camille Fjetland is his successor.
[3] We note we have reviewed the numerous amici briefs and responses filed in this case, which argue theories based on joint and several liability, the plain terms of the contract, trigger analysis, and allocation case law.
[4] The dissent claims Gruol is inapposite because it involved "a single injury which worsened over several policy periods," dissent at 259, and the insured maintained coverage "throughout the period of the damage." Dissent at 259. These differences, however, do not require the conclusion the dissent urges. As noted above, Gruol is persuasive as to its holding on joint and several liability. Namely, that in a continuing damage situation, each insurer is held jointly and severally liable for the full amount of damage, regardless of the amount that occurred during its policy period. That Fjetland did not maintain insurance over the entire period of damage is of no moment.
[5] The dissent accuses the majority of ignoring the policy language. Dissent at 258. However, this very definition of "occurrence," found in Northern's insurance contract, contemplates the facts of this case.
[6] While arguing we have "rewritten the policy," dissent 260, the dissent attempts to impose a pro rata allocation where no pro rata clause appears in the language of the insurance contract and was not bargained for between the parties. By so doing, it is actually the dissent, not the majority, which has altered the understanding between the parties.
[7] We emphasize this rule does not apply to situations where the insured continues to exacerbate the pollution damage. The known risk doctrine would apply in those cases and would preclude coverage during a policy period in which the insured continued to knowingly pollute.
[8] By not holding Fjetland liable, the dissent warns that the majority has created "moral hazard" by not providing insureds who become aware of pollution damage enough incentive to remedy damages caused by the pollution. Dissent at 258. Under the dissent's theory, however, the insured would be in a better position to remain totally ignorant of pollution damage in the first place. Such a policy encourages, rather than discourages, destruction of our environment.
[1] The fact that the insured's liability for clean-up costs under CERCLA is joint and several does not require joint and several liability for coverage by successive insurers, because insurance coverage disputes are governed by contract law and require construction of the insurance policy at issue.
[2] While some courts distinguish those cases where the insured has affirmatively elected self-insurance (going bare) from those where, for example, coverage is not available, in either case, the insurer which has contracted to provide coverage for insured periods has not contracted to provide coverage for damage outside the policy period.
[3] Of course, as Judge Pro Tempore Wiggins recognized in this case, no "rule" of apportionment may be needed where competent evidence provides a basis for the trier of fact to apportion damage among carriers and the insured where both insured and uninsured periods are involved.