[No. 26647-8-III.    Division Three.    April 14, 2009.]

WALLA WALLA COLLEGE, *Appellant*, v. OHIO CASUALTY
INSURANCE COMPANY ET AL., *Respondents*.

*David M. Rose*, for appellant.

*William G. Earle* (of *Davis Rothwell Earle & Xochihua, PC*) (*Jonathan Henderson*, of counsel), for respondents.

¶1 KULIK, A.C.J. — In 1991, Walla Walla College purchased three fiberglass underground storage tanks from 3-D Tank & Petroleum Equipment Co., Inc. 3-D Tank also installed the tanks. Ten years later, approximately 10,000 gallons of gasoline leaked from one tank into the ground. Great American Insurance, now Ohio Casualty, insured Walla Walla College under commercial general liability policies from January 23, 1990, until January 23, 1992. Walla Walla College asserts that these policies covered the losses caused by the gasoline leak because the tanks were improperly installed, which resulted in the gasoline leak. The trial court granted summary judgment in favor of Ohio Casualty.

¶2 The question to resolve is: Did property damage occur when the tank was improperly installed in 1991, or did property damage occur 10 years later when the tank ruptured and leaked? We hold that property damage under the policies occurred when the tank leaked and, thus, after the liability coverage expired. Therefore, we affirm the trial court's grant of summary judgment.

## FACTS

¶3 3-D Tank & Petroleum Equipment Co., Inc., (3-D Tank) sold three fiberglass underground storage tanks to Walla Walla College (College). 3-D Tank installed the tanks at a gas station owned by the College. The installation of the tanks was completed prior to December 31, 1991. Between September 4 and 21, 2001, approximately 8,000 to 10,000 gallons of gasoline leaked from one of the tanks installed by 3-D Tank. An inspection of the tank revealed a 56-inch opening in the bottom of the tank.

¶4 The College incurred expenses and loss of revenue as the result of the remediation effort required to clean up the pollution caused by the gasoline leak. 3-D Tank had two commercial general liability (CGL) policies with Ohio Casualty that were in effect from January 23, 1990, until January 23, 1992.

¶5 The College filed its first action against 3-D Tank and its former owner, Estate of Justin DeBroeck. In this action, the College contends the gasoline leaked through the crack in the bottom of the tank as the result of a downward rotation of the end cap of the tank causing the bottom of the tank to buckle and crack. According to the College, the end cap droop was caused by insufficient backfill under the tank. The College asserts that 3-D Tank was negligent in obtaining or preparing the backfill.

¶6 The College's first action has been stayed pending the resolution of this declaratory judgment action. The purpose of this second action is to determine whether the CGL policies issued by Ohio Casualty cover the losses sustained by the College as the result of the gasoline leak.

¶7 The parties filed cross motions for summary judgment. The College presented the testimony of several experts. John M. Clark described the process resulting in the failure of the underground storage tank as follows:

> Immediately after installation, the unsupported area of the tank gradually began to move and deflect because of the voids in the backfill. As time passes, movement and deflections continue due to the backfill consolidation over time, ultimately resulting in excessive strains on the tank that resulted in failure by buckling of the shell wall and finally by fracturing. The time to failure, eleven years, is not unexpected for an improper installation, since the strain begins to increase immediately after installation due to creep from the excessive stress. The strain finally becomes too large, resulting in tank failure. Therefore, to a degree of scientific certainty the physical damage to the tank started immediately after completion of the installation or possibly during installation, and was ongoing throughout its life until failure.

Clerk's Papers (CP) at 325.

¶8 The trial court granted summary judgment in favor of Ohio Casualty. The College appeals.

## ANALYSIS

¶9 Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). When reviewing a summary judgment order, an appellate court engages in the same inquiry as the trial court. *Id.* Facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. *Bishop v. Miche*, 137 Wn.2d 518, 523, 973 P.2d 465 (1999). Conclusions of law are reviewed de novo. *Id.*

¶10 The interpretation of an insurance policy is a question of law reviewed de novo. *Alaska Nat'l Ins. Co. v. Bryan*, 125 Wn. App. 24, 30, 104 P.3d 1 (2004). The party asserting coverage bears the burden of proving the loss is a covered occurrence within the policy period. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 70, 882 P.2d 703 (1994). The insurer bears the burden of showing an exclusion applies. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (1992).

¶11 Terms in an insurance policy are given their plain, ordinary, and popular meaning as they would be understood by the average purchaser, and exclusions in insurance policies are strictly construed against the insurers. *See Queen City Farms*, 126 Wn.2d at 74.

¶12 Ohio Casualty issued two CGL insurance policies to Mr. DeBroeck and 3-D Tank. The first policy expired on January 23, 1991. The second policy expired on January 23, 1992. The policies used the same basic form. The College asserts the CGL policies issued by Ohio Casualty cover the losses sustained as the result of the September 2001 gasoline leak.

¶13 The insuring agreement in the policies provided in relevant part:

1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

. . . .

b. This insurance applies to . . . "property damage" only if:

. . . .

(2) the . . . "property damage" occurs during the policy period.

CP at 24.

¶14 The insurance policies defined the words "property damage" as follows:

12. "Property damage" means:

a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

CP at 35. " 'Occurrence' means an accident, *including continuous or repeated exposure* to substantially the same general harmful conditions." CP at 35 (emphasis added).

¶15 Significantly, the "your product" provision in the policies excludes coverage for the tank itself.[1] The College does not argue that there was coverage for physical damage to the tank.

¶16 Here, coverage under both policies is triggered by "property damage" during the policy periods. The College contends the damage to the tank occurred immediately upon its installation, starting a continuing process that resulted in the tank's failure. To support this view, the College relies on *Gruol Construction Co. v. Insurance Co. of*

---

[1] "Your product" is defined as "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . you." CP at 36.

*North America*, 11 Wn. App. 632, 524 P.2d 427 (1974), *Villella v. Public Employees Mutual Insurance Co.*, 106 Wn.2d 806, 725 P.2d 957 (1986), and *American National Fire Insurance Co. v. B&L Trucking & Construction Co.*, 134 Wn.2d 413, 951 P.2d 250 (1998).

¶17 Kenneth Gruol owned a construction business. Mr. Donovan sued Mr. Gruol for dry rot caused by backfilling that piled dirt against the building's box sills during construction. The dry rot was discovered four years after the completion of the building. Mr. Gruol settled with Mr. Donovan and brought an action against his insurers for failure to defend. *Gruol*, 11 Wn. App. at 633. The court considered whether the dry rot was an "accident" or "occurrence" under the policy. The policy defined an "occurrence" as an "accident" or a " 'continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction of property.' " *Id.* at 634.

¶18 The court concluded that there was coverage for the defective work because the resulting damages were continuous and unforeseeable. *Id.* at 636. The court drew a distinction between the concepts of an initial negligent act and any covered damage. The court explained that coverage for the resulting damage was proper because the damage was continuous from the initial negligent act. *Id.* The court concluded that the damage, while continuing, constituted a single injury. *Id.* at 637-38.

¶19 In *Villella*, the Villellas sought recovery for damage to their home that was caused by the sinking foundation. The Villellas purchased the house new in 1979. In 1983, the foundation on one side of the house sank eight inches. The Villellas sought recovery under policies in effect between 1979 and 1982. They argued that the damage was part of a continuing process of damage that began with the negligent construction of a drainage system and culminated with the damage to the house. *Villella*, 106 Wn.2d at 810-11.

¶20 The court rejected the continuing process argument because the house had not sustained damage before the expiration of the policies. The court concluded that an

insured must sustain a covered injury or loss during the policy period in order to trigger coverage. *Id.* at 814.

¶21 In *American National Fire Insurance*, the court discussed *Gruol* and *Villella*. The court stated:

> In *Villella*, we addressed the effect of continuing property damage on the triggering of insurance policies. In that case, we quoted *Forty-Eight Insulations*, which stated: "[W]hen courts are dealing with property damage situations where damages slowly accumulate, courts have generally applied the exposure theory. *So long as there is tangible damage*, even if minute, courts have allowed coverage from that time." *Villella*, 106 Wn.2d at 814 (quoting [*Ins. Co. of N. Am. v.*] *Forty-Eight Insulations*, [*Inc.*, ]633 F.2d [1212,] 1222 n.18 (6th Cir. 1980)]). Hence, in *Villella*, we accepted that when damage is continuing, all triggered policies provide full coverage.

*Am. Nat'l Fire Ins.*, 134 Wn.2d at 425 (first alteration in original).

¶22 *Gruol, Villella*, and *American National Fire Insurance* require damage that is continuing. This means that the damage must occur first, followed by a continuing process. The College argues that the defective backfill caused a continuous process of damage to the tank. We disagree. Here, a process began, but property damage did not occur until the tank failed in September 2001, long after the policies had expired.

¶23 The College also relies on *Marley Orchard Corp. v. Travelers Indemnity Co.*, 50 Wn. App. 801, 750 P.2d 1294 (1988). Marley contracted with Irrigation Specialists, Inc. (ISI) for the design and installation of an automated sprinkler system in its orchard. The system was installed in 1979, but in 1983, some trees exhibited stress. Marley sued ISI, who was defended by Travelers. *Id.* at 802-03. The trial court found that the irrigation system was inadequate and caused stress to the trees. The court awarded Marley compensation for the cost of completing the irrigation system. *Id.* at 806. On appeal, the court found that the stress to the trees was property damage under the policy and that the policy covered consequential damages. The

court upheld the trial court's award of damages because the cost of completing the irrigation system was necessary to minimize the property damage evidenced by stress to the trees. *Id.* at 809.

¶24 There are important distinctions between *Marley* and the case here. First, *Marley* did not involve a situation where the policy lapsed before the damage occurred. Second, in *Marley*, there was no claim or evidence that the product or work performed was damaged. Here, any damage to the tank during the policy period was not covered because of the "damage to 'your product' " exclusion.

¶25 Ohio Casualty relies primarily on *Wellbrock v. Assurance Co. of America*, 90 Wn. App. 234, 951 P.2d 367 (1998). In *Wellbrock*, Bowen Development Company built a house for the Alvarados on a lot adjacent to Marlene and Varianne Wellbrock's lot. When excavating, clearing, and grading the Alvarados' lot, Bowen damaged the roots of several trees. This damage hastened the existing visible rot and diseased condition of the trees. Eventually, several of the trees fell onto the Wellbrocks' lot, and one of those trees killed Mr. Wellbrock. An arborist determined that this tree fell because of the damage to its roots caused by Bowen. *Id.* at 237.

¶26 Ms. Wellbrock brought an action against Bowen, seeking property and personal injury damages. The trial court granted summary judgment in favor of Assurance, Bowen's insurance carrier. *Id.* at 238-39. On appeal, the parties agreed that Bowen was negligent, but they disagreed as to whether the damage to the roots triggered coverage or whether the triggering occurrence was the falling of the tree that caused the physical injury. *Id.* at 240.

¶27 Examining cases such as *Gruol* and *Villella*, the court determined that these cases established that "an 'occurrence' for insurance coverage purposes is determined by reference to the time the aggrieved party sustains an injury, not the time the initial negligence or damage occurred." *Id.* at 242. Accordingly, the court held that "the coverage-triggering 'occurrence' *refers to the event causing*

*injury to the complaining party, not the earlier event that created potential for future injury." Id.* at 243 (emphasis added). The court affirmed the trial court because the policy had expired before the event causing the injury. *Id.* at 244.

¶28 Similarly here, the event that caused the injury to the College occurred after the policy had lapsed, i.e., when the tank failed. The College seeks damages for the contamination of other property, not damages to the tank itself or the fuel storage system. If we assume that stress or damage to the tank occurred during the policy period, the damage would have been excluded under the policies. And the contamination to the surrounding property did not occur until after these policies had lapsed.

¶29 The College next contends that there are two kinds of property damage—damage to the storage tank and diminution in value. The policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." CP at 35. In *Guelich v. American Protection Insurance Co.,* 54 Wn. App. 117, 119-20, 772 P.2d 536 (1989), the court examined the same definition and determined that the loss of a view did not constitute physical injury to tangible property. Likewise here, the College cannot establish that diminution in the value of the tank is property damage under the policies.

¶30 The College argues that there is a question of fact as to whether the damage to the tank was a continuing process that started during installation. The College's expert, John M. Clark, stated that the "probable start of damage was immediately after installation or possibly during installation with damage being the start of micro-cracking of the resin and breaking of bonds between the glass fibers and the resin." CP at 324. Mr. Clark explained that the failure took 11 years because "fiberglass is, by its nature, time dependent and is also dependent on the applied stress level." CP at 324.

¶31 However, while a process may have started at the time of installation, there was no actual property damage until the tank failed in 2001. Stress to the tank did not

constitute "property damage" under the policy as it is not "physical injury to tangible property" and the "your product" exclusion applies. We conclude there is no genuine issue of material fact indicating that property damage occurred during the policy periods.

¶32 We affirm the trial court's grant of summary judgment.

SWEENEY and KORSMO, JJ., concur.